UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAR 28 2006

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JUVENAL OVIDIO RICARDO
PALMERA PINEDA,

Defendant.

Cr. No. 04-232 (TFH)

## MEMORANDUM OPINION

Pending before the Court are the following motions filed by the defendant, Juvenal

Ovidio Ricardo Palmera Pineda, who will hereafter be referred to by his nom de guerre, Simon

Trinidad: (1) Motion to Dismiss, (2) Motion to Suppress and (3) Motion to Strike Surplusage.

After carefully considering the parties' legal briefs, the arguments presented at the hearings held

January 24-25, 2006, the supplemental legal briefs filed by the parties after the hearing, and the

entire record in this case, the Court will deny the defendant's motions for the reasons that follow.

### BACKGROUND

On March 13, 2004, a federal grand jury returned a five-count indictment against

defendants Simon Trinidad and Fuerzas Armadas Revolucion Arias De Colombia ("FARC") for

conspiracy to commit hostage taking, hostage taking, aiding and abetting and causing an act to be

done, and material support of terrorists, in violation of 18 U.S.C. §§ 2, 1203(a) and 2339A.[1]  The

indictment alleges that the defendants conspired to seize, detain, threaten to kill and injure United

---

[1]     The indictment also alleges that, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. §
981(a)(1)(G), the defendants forfeited all assets involving international terrorism
or affording a source of influence over FARC.

States nationals and other foreign nationals in the Republic of Colombia ("Colombia") for the purpose of compelling the Colombian government to exchange prisoners with FARC and establish a demilitarized zone. Indictment ¶ 10. The indictment outlines a number of acts committed by the defendants in furtherance of the conspiracy, including allegedly authorizing a gunfire attack against a small plane carrying four United States nationals, Thomas Howes, Keith Stansell, Marc Gonsalves and Thomas Janis, as well as a Colombian national, Sergeant Luis Alcides Cruz. Id. at ¶¶ 11-12. According to the indictment, FARC took all of these men hostage and immediately shot and killed Thomas Janis and Sergeant Luis Alcides Cruz. Id. The remaining hostages reportedly continue to be detained at remote locations in the jungles of Colombia. Id. at ¶¶ 11(g)-(h), 12(g)-(h), 12(s). FARC later issued a public communique addressed to four ex-presidents of Colombia stating that FARC was detaining the three remaining American hostages and offering to negotiate a hostage release in exchange for political concessions from the Government of Colombia. Id. at ¶¶ 12(I)-(j). That communique identified Simon Trinidad as one of FARC's representatives authorized to negotiate such a hostage release. Id. at 12(j).

Individually, Simon Trinidad is accused of providing material support and resources to terrorists, i.e., the FARC, knowing that the support and resources would be used to commit the conspiracy and hostage taking. Id. at ¶¶ 11, 12. He also is alleged to have traveled illegally to Ecuador to obtain fraudulent identification documents that would allow him to assume a false identity to travel to participate in hostage-release negotiations on behalf of the FARC. Id.

Simon Trinidad was extradited to the United States from Colombia and is awaiting trial. He now seeks to dismiss the indictment against him on the grounds that he is entitled to lawful combatant immunity and Congress did not intend for the hostage taking statute to apply when a

2

combatant captures and detains a United States citizen who deliberately allied himself with and assisted the combatant's enemy in a foreign conflict. Def.'s Mot. Dismiss 1-2. He also filed motions seeking to suppress certain statements he made to Federal Bureau of Investigations ("FBI") agents and to strike surplus language from the indictment. These motions were filed on Simon Trinidad's behalf and do not apply to FARC; accordingly, the Court's reference to "the defendant" hereafter identifies Simon Trinidad and excludes FARC. The merits of each motion will be addressed in turn.

## DISCUSSION

## I.    DEFENDANT'S MOTION TO DISMISS

It is well established that the Court must treat as true all allegations contained in the indictment when considering a motion to dismiss. Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952) ("It should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true."). As the court explained in United States v. Lattimore, 215 F.2d 847, 852 (D.C. Cir. 1954):

> The sole question . . . is the validity of the indictment against a motion to dismiss. Upon such a motion the allegations of the indictment must be accepted as they are written. What they may turn out to be upon the trial, when the evidence is in, is another and different problem. For example, materiality upon the face of an indictment and materiality in the light of all the evidence may be critically different. At this present stage we must, as the Government contends, refrain from making, or appearing to make, factual findings outside those which bear upon the legal sufficiency of the indictment as returned by the grand jury.

See also United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 33 n.2 (1963) (noting that when reviewing a lower court's decision to grant a motion to dismiss "we are required to accept well-pleaded allegations of the indictment as the hypothesis for decision"). The defendant does not challenge this premise or argue that the facts contained in the indictment fail to allege the essential elements of the federal crimes. Instead, he contends that dismissal is warranted because

3

he is shielded from prosecution by the doctrine of lawful combatant immunity and, alternatively,

he is not subject to prosecution under the hostage taking statute because the statute does not

apply to a lawful combatant who captures a United States citizen allied with the combatant's

enemy.  Def.'s Mot. Dismiss 22-41.

### A. Whether Dismissal is Warranted Because Simon Trinidad is a Lawful Combatant Who is Immune from Prosecution

The doctrine of lawful combatant immunity is derived from international law governing

the status of prisoners of war and finds its roots in the customary law, treaties, conventions,

protocol and other such agreements between nations that prescribe the rights of enemy

combatants during the conduct of war.[2]  Most notable for this Court's purposes is the Geneva

Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75

U.N.T.S. 135 available at 1949 U.S.T. LEXIS 483 [hereinafter the "Geneva Convention"],[3] to

which the United States is a signatory.  The Geneva Convention provides that "[p]risoners of war

may not be sentenced by the military authorities and courts of the Detaining Power to any

penalties except those provided for in respect of members of the armed forces of the said Power

who have committed the same acts."  Geneva Convention art. 87.  The Convention further

---

[2]    E.g., Ex Parte Quirin, 317 U.S. 1, 10 (1942) (noting that "[f]rom the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals"); United States v. Lindh, 212 F. Supp.2d 541, 553 (E.D. Va. 2002) (observing that lawful combatant immunity "has a long history, which is reflected in part in various early international conventions, statutes and documents").

[3]    This treaty is the third in a series of conventions and protocol that are commonly referred to as the "Geneva Conventions."  For convenience, the Court hereafter will cite to the applicable Article of the Geneva Convention Relative to the Treatment of Prisoners of War (e.g., "Geneva Convention art. 87"), which will provide a common point of reference regardless of the source from which a copy of the treaty text is obtained.

4

provides that "[n]o prisoner of war may be tried or sentenced for an act which is not forbidden by the law of the Detaining Power or by international law, in force at the time the said act was committed." Id. at art. 99. Stated more succinctly, the Geneva Convention prohibits prisoners of war from being prosecuted for lawful acts of war. Lindh, 212 F. Supp.2d at 553 ("These Articles, when read together, make clear that a belligerent in a war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war."). To qualify as a prisoner of war subject to the Geneva Convention, the defendant must demonstrate that he has "fallen into the power of the enemy" and belongs to a militia or other volunteer corps that (1) is commanded by a person responsible for his subordinates, (2) has a fixed distinctive sign recognizable at a distance, (3) carries arms openly and (4) conducts its operations in accordance with the laws and customs of war.[4]  Geneva Convention art. 4(A)(2).

The defendant's argument that he is entitled to prisoner of war status and, as a corollary, lawful combatant immunity ultimately is unpersuasive. As a threshold matter, the Geneva Convention applies to international armed conflicts between two or more "High Contracting

---

[4]    The parties also refer to the Hague Convention Respecting the Laws and Customs of War on Land, with Annex of Regulations, Jan. 26, 1910, 36 Stat. 2277, which is an earlier treaty that governed the conduct of war and provided a similar framework for establishing lawful combatant status defined in terms of "belligerency." Def.'s Reply Supp. Mot. Dismiss 9; Gov't Opp. Mot. Dismiss 6-7. The same analysis the Court applies to determine applicability of the Geneva Convention is equally relevant to consideration of the Hague Convention. As was the case with the Geneva Convention, the United States is a signatory to the Hague Convention, but FARC is not. The Hague Convention and its regulations "do not apply except between Contracting Powers, and then only if all the belligerents are parties to the Convention." Hague Convention, Jan. 26, 1910, 36 Stat. 2277. The Hague Convention therefore is inapplicable to the defendant because he is not a party to the treaty.

Parties," i.e., nations that are signatories to the treaty.[5]  Id. at art. 2. Although the United States is

such a High Contracting Party, FARC is not. Moreover, the defendant offers no evidence that

FARC is involved in any armed conflict with the United States. To the contrary, the defendant

expounds rather extensively about the status of the strife between FARC and Colombia, citing

numerous academic commentaries that make clear that FARC and Colombia are the relevant

parties to the armed conflict at issue in this case, which involves a purported civil war and not an

international conflict.[6]  Def.'s Mot. Dismiss 6-13. Indeed, the defendant concedes in his motion

to dismiss that "the United States has not directly intervened militarily in the civil conflict in

---

[5]     Note that Article 3 of the Geneva Convention applies to non-international armed
        conflicts "occurring in the territory of one of the High Contracting Parties."
        Because Colombia is a High Contracting Party, and the conflict at issue is
        occurring in its territory, the provisions of Article 3 arguably apply to the
        hostilities between FARC and Colombia. That does not, however, resolve the
        question of FARC's status under the Geneva Convention with respect to the
        United States given that the conflict at issue is not occurring in a territory of the
        United States.

        The defendant also cites to the Protocol Additional to the Geneva Conventions of
        12 August 1949, and Relating to the Protection of Victims of Non-International
        Armed Conflicts, 8 June 1977, 1125 U.N.T.S. 609 [commonly referred to as
        "Protocol II"]. Def.'s Mot. Dismiss 33; Def.'s Reply Supp. Mot. Dismiss 9.
        Although the United States was a signatory to that treaty, the United States'
        signature was never ratified, so the treaty is not binding to our country. The
        defendant concedes this point. Def.'s Reply Supp. Mot. Dismiss 9 (stating "[i]t is
        true that the United States had not signed Protocol II"). As a result, that treaty has
        never taken effect with regard to the United States and the Court is unwilling to
        judicially enforce a treaty that the legislative branch, in its proper discretion,
        elected not to ratify.

[6]     The defendant refers to "FARC's forty-year war against the Colombian
        government" and the "Colombian civil war." Id. at 5, 6-13; Def.'s Reply Supp.
        Mot. Dismiss 3. The defendant also states that FARC "is engaged in a long-
        standing civil war in a defined country . . . ." Def.'s Reply 14. Nowhere does the
        defendant mention any conflict that would bring the matter within the purview of
        the Geneva Convention with respect to the United States.

Colombia . . . ."[7]  Id. at 17.  Consequently, the defendant is unable to show that he has "fallen into the power of the enemy" such that he would be subject to Geneva Convention protection with regard to his detention and prosecution by the United States.

Even if the Geneva Convention did apply, the Court is unpersuaded that the defendant would qualify as a prisoner of war because FARC fails to meet the Geneva Convention's definition of a lawful combatant.[8]  As mentioned previously, to qualify as a lawful combatant entitled to prisoner-of-war status the defendant must demonstrate that he is a member of a militia that is commanded by a person responsible for his subordinates, has a fixed distinctive sign recognizable at a distance, carries arms openly and conducts its operations in accordance with the laws and customs of war.  Geneva Convention art. 4(A)(2).  Although the parties dispute whether

---

[7]     The defendant attempts to establish a nexus between the United States and the conflict in Colombia by arguing that "the United States government has placed military personnel in Colombia to advise and assist the Colombian military in its war with the FARC and the other insurgencies, infused large sums of money to accomplish that goal and, more important for the facts of this case, has utilized the services of private military contractors or companies to evade restrictions on direct intervention in the conflict."  Def.'s Mot. Dismiss 17.  The defendant cites no source of authority for these contentions other than an untested affidavit that contains conclusory statements but generally offers no source to verify those statements (Chernick Aff. ¶¶ 30-33); as a result, at this early stage in the proceedings there are no facts before the Court to support these assertions.  Furthermore, there is no evidence that the United States has actually taken up arms against FARC.  At best, the defendant alleges that the United States funds "equipment and training" for the Colombian government.  Def.'s Mot. Dismiss 20.  Even if true, the defendant cites no authority for the proposition that such action is tantamount to taking up arms against an enemy combatant.

[8]     In Ex Parte Quirin, 317 U.S. at 12, the Supreme Court discerned that "[b]y universal agreement and practice, the law of war draws a distinction between . . . those who are lawful and unlawful combatants."  The Court stated that "[l]awful combatants are subject to capture and detention as prisoners of war by opposing military forces."  Id.  Unlawful combatants also are subject to capture and detention "but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful."  Id.

7

FARC meets the first three requirements,[9] there appears to be no dispute that FARC fails to meet the last, which mandates that a militia or other volunteer corps comply with the laws and customs of war. The defendant does not hide the fact that FARC "has committed violations of the rules of war while otherwise operating as a recognized military organization engaged in a civil war."[10] Def.'s Mot. Dismiss 28. The defendant further acknowledges that FARC "has apparently engaged in acts that do not accord with the rules of war." Id. The defendant argues, however, that it is of no consequence that FARC violates the laws and customs of war because Colombia's government is guilty of the same failings. Id. at 36-37 (arguing at page 35 that "[a]lthough the FARC has engaged in conduct in violation of the rules of war, so have all the parties to the conflict, including the Armed Forces of the [Government of Colombia] and private armed forces acting on behalf of the [Government of Colombia]"); Def.'s Reply Supp. Mot. Dismiss 11-14 (stating that "the evidence suggests that all parties to the Colombian conflict apparently violate the laws and customs of war as contemplated by the Geneva Conventions and supplemental Protocols"). The Court is aware of no authority, and the defendant cited none, to support the contention that noncompliance with the customs and laws of war will be overlooked for purposes of invoking lawful combatant immunity so long as both parties to the conflict are guilty of violations. More importantly, this argument does not advance the defendant's cause with regard

---

[9]    Gov't Opp. Mot. Dismiss 12 (arguing that "there is reason to question whether the defendant can satisfy any of the four criteria of a lawful combatant under Article 4, because the FARC regularly engages in terrorist attacks on the civilian population in Colombia in which its operatives do not wear uniforms or carry their arms openly").

[10]    In support of its opposition to the defendant's Motion to Dismiss, the Government cites to United Nations reports, as well as reports by other international organizations, identifying specific acts that arguably violate the various Geneva Conventions. Gov't's Opp. 14-23.

to whether he is a prisoner of war of the United States since Colombia's conduct is not the relevant inquiry for that purpose.

The defendant also claims that detaining passengers of the downed aircraft was not unlawful because the passengers were prisoners of war lawfully captured by FARC. Def.'s Mot. Dismiss 18 (stating that FARC viewed "the three Americans as lawfully captured prisoners-of-war when their aircraft went down over FARC-controlled territory"). With regard to this argument, however, the defendant admits that "there is no evidence [the Americans] were directly engaged in fighting on behalf of the [Government of Colombia]," thereby calling into question the notion that the Americans were enemy combatants of FARC. Def.'s Reply 21 n.12. In addition, the Court notes that, even if the Americans could be deemed combatants, the law of war prescribes protections for the treatment of prisoners of war, which the indictment indicates were violated by FARC and the defendant. For instance, the Geneva Convention prohibits any unlawful act or omission by the detaining power that causes death or seriously endangers the health of a prisoner of war and further mandates that prisoners of war be protected against acts of violence or intimidation. Geneva Convention art. 13. Viewing the facts contained in the indictment as true for the purpose of the instant motion, the indictment alleges that FARC unlawfully shot and killed two aircraft passengers immediately after they were detained. The FARC therefore violated the law of war with regard to the treatment of two individuals it claims were prisoners of war. In Re Yamashita, 327 U.S. 1, 14 (1946) (acknowledging that "acts of violence, cruelty and homicide" inflicted on prisoners of war "are recognized in international law as violations of the law of war"); Kadic v. Karadzic, 70 F.3d 232, 242 (2d Cir. 1995) (agreeing that "acts of murder, rape, torture, and arbitrary detention of civilians" committed during hostilities violate the law of war).

The Court also points out that the defendant himself confirmed that "[t]he FARC holds captured Colombian soldiers and officers, policemen and others in its custody." Def.'s Mot. Dismiss 4. The Court will not speculate about the portent of the term "and others" but notes that the Geneva Convention expressly prohibits taking hostage those persons not actively part of the hostilities. Geneva Convention art. 3(1)(b). Thus, any such civilian hostage taking also would violate the law of war. Kadic, 70 F.3d at 242.

The fact of the matter is that the indictment alleges FARC is a terrorist organization that engaged in "murder, hostage taking, and the violent destruction of property" and conspired with the defendant to "seize and detain and threaten to kill, injure and continue to detain United States nationals and other foreign nationals working in Colombia." Indictment ¶¶ 1, 10. The indictment also alleges that FARC attacked an aircraft and seized hostages after the aircraft crash landed, and that the defendant was a co-conspirator to these acts and other illegal acts. Id. at ¶ 11. Assuming these allegations to be true, as the Court must to resolve the motion, it is the Court's view that, even if the defendant was an enemy combatant, he likely would not qualify for lawful combatant immunity because FARC engaged in unlawful acts that violate the laws of war.[11]

Finally, the Court is mindful that "whether a state of armed conflict exists against an enemy to which the laws of war apply is a political question for the President, not the courts."[12]

---

[11]    The Geneva Convention expressly states that wilful killing, torture or inhumane treatment and wilfully causing great suffering or serious injury to body or health are "grave" breaches of the Convention if committed against a prisoner of war. Geneva Convention art. 130.

[12]    The defendant agrees that the question of whether FARC is a lawful combatant is "beyond the Court's jurisdiction, as the determination of how to diplomatically treat parties to a foreign conflict is quintessentially a political one reserved to other branches of government." Def.'s Mot. 29.

Padilla v. Rumsfeld, 352 F.3d 695, 712 (2d Cir. 2003), rev'd on other grounds, Rumsfeld v.

Padilla, 542 U.S. 426 (2004) (citing Johnson v. Eisentrager, 339 U.S. 763, 789 (1950) and The

Brig Amy Warwick, 67 U.S. (2 Black) 635, 670 (1862)).  Because the defendant's claim of

immunity is intertwined with the question of FARC's status as a combatant, the Court is hesitant

to delve into an area that may be so "vitally and intricately interwoven with contemporaneous

policies in regard to the conduct of foreign relations" that it is "immune from judicial inquiry or

interference."  Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952).  The Court is

particularly reluctant in a case such as this in which the conflict at issue involves application of

the law of war to foreign parties engaged in an internal conflict in a foreign nation when the

United States is not a direct party to that conflict.  The defendant's pursuit of lawful combatant

immunity would, in this unique case, involve the Court in a judicial determination about the

merits of the conflict between the Colombian government and FARC and a pronouncement about

whether the United States is a party to that conflict, which would involve the Court in a decision

reserved exclusively for Congress and the President.[13]  Oetjen v. Central Leather Co., 246 U.S.

297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the

---

[13]     The Government correctly points out that there are only three cases in which
federal courts have passed judgment about whether a defendant was entitled to
lawful combatant immunity, none of which is controlling.  In all three cases the
district court rejected the application of lawful combatant immunity to the
defendant.  United States v. Lindh, 212 F. Supp.2d 541 (E.D. Va. 2002) (The
defendant, an American citizen, argued that he was entitled to the affirmative
defense of lawful combatant immunity because he was a Taliban soldier.); United
States v. Arnaout, 236 F. Supp.2d 916 (N.D. Ill. 2003) (American accused of
providing material support and resources to multiple terrorist groups via aid from
an international charitable organization sought lawful combatant immunity).
United States v. Al-Hussayen, Case No. CR03-048-C-EJL, slip. op. (D. Id. 2004)
(The defendant sought to dismiss two counts of an indictment charging him with
conspiracy to violate and violation of a statute making it a crime to provide
material support to terrorists on the ground that he was entitled to lawful
combatant immunity.).

Constitution to the Executive and Legislative -- "the political" -- Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.").

For all the stated reasons, the Court holds that the defendant has not established that he is entitled to dismissal of the indictment on the ground that he is immune from prosecution as a lawful enemy combatant.

### B. Whether Congress Intended 18 U.S.C. § 1203 to Apply When a U.S. Citizen Allies Himself with a Party to an Ongoing Foreign Conflict

The defendant also pursues dismissal based on the alternate theory that "Congress never intended [the provisions of 18 U.S.C. § 1203] to apply where, as here, a U.S. citizen deliberately allies himself with a party in an on-going foreign conflict and, while engaged in activities that assist that party, is captured by the opposing party." Def.'s Mot. 37. The gist of the defendant's argument is that 18 U.S.C. § 1203 does not apply to the taking of hostages during the course of armed conflicts covered by the Geneva Conventions and protocols. Id. at 39. The defendant argues that this result is compelled by the fact that 18 U.S.C. § 1203 was enacted to implement the International Convention Against the Taking of Hostages, Dec. 18, 1979, T.I.A.S. No. 11, 081 [hereinafter referred to as the "Hostage Taking Convention"], which contains a provision stating that the international treaty "shall not apply to an act of hostage taking committed in the course of armed conflicts defined in the Geneva Conventions of 1949 and the Protocols thereto . . . ." Def.'s Mot. 37-38. The Government opposes the defendant's motion and argues that 18 U.S.C. § 1203 is unambiguous and "places no 'carve out' for Americans who are captured during the course of an ongoing armed conflict in a foreign country." Gov't Opp. 28-29.

The Court's analysis "begins with the statutory text, and ends there as well if the text is

unambiguous." <u>Bedroc Ltd. v. United States</u>, 541 U.S. 176, 183 (2004) (noting that "[t]he

preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in

a statute what it means and means in a statute what it says there'"). In this case, the statute at

issue states:

> (a)     Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.
>
> (b)     (1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—
>
>> (A) the offender or the person seized or detained is a national of the United States;
>>
>> (B) the offender is found in the United States; or
>>
>> (C) the governmental organization sought to be compelled is the Government of the United States.
>
>> (2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203. Thus, there is no question that the scope of the statute reaches anyone that (1)

seizes or detains another person and (2) threatens to kill, injure or continue to detain that person

(3) to compel a third party to take action or refrain from taking action (4) as a condition for the

person's release is subject to the statute unless the conduct is excluded by Section (b).[14] <u>Id.</u>

---

[14]     The Court notes that the statute has been upheld against several constitutional challenges, including a challenge that the statute exceeds Congress's power under

American soldiers hostage. It is axiomatic, under international law, that hostage taking is prohibited, even among enemy combatants. In the case of a non-international armed conflict occurring in the territory of a High Contracting Party, which arguably describes the conflict between FARC and the Government of Colombia, Article 3 of the Geneva Convention prohibits taking hostage "members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause." Geneva Convention art. 3. Even with regard to armed conflicts of an international nature, the Geneva Convention contemplates that an enemy combatant may prosecute a prisoner of war for illegal acts committed prior to capture, which presumably might include hostage taking. Id. at art. 85 (indicating that prisoners of war may be prosecuted under the laws of the Detaining Power for acts committed prior to capture), art. 99 (evidencing that a prisoner of war may be tried or sentenced for an act forbidden by the law of the Detaining Power or by international law in force at the time the act was committed).

The Court also observes that the express language of 18 U.S.C. § 1203 appears to preclude the statute from being applied to the lawful capture and detention of prisoners of war. This is so because liability under the statute requires proof that the captor threatened to kill, injure or continue to detain the captive and conditioned the captive's release on action or abstention by a third party. 18 U.S.C. § 1203. It is established international law, however, that a detainee lawfully captured as a prisoner of war must be protected against acts of violence or intimidation and the prisoner of war's release is unconditional once hostilities have ended.[16] Geneva Convention art. 13 (stating that "prisoners of war must at all times be protected,

---

[16]   With the exception of prisoners of war against whom criminal proceedings for an indictable offense are pending or who have been convicted of an indictable offense. Geneva Convention art. 119.

The Court is inclined to agree with the Government that there is no ambiguity regarding the statute's scope or the persons and acts covered. Although the statute's application to "whoever" engages in the prohibited acts is broad, there is no authority to conclude that fact alone renders it ambiguous. Moreover, because the Court finds the statute unambiguous, it need not, and indeed should not, inquire into its history. "Legislative history is irrelevant to the interpretation of an unambiguous statute." Davis v. Michigan Dept. of the Treasury, 489 U.S. 803, 808 n.3 (1989). As far as Congress's intent is concerned, "[t]he starting point in discerning congressional intent is the existing statutory text . . . and not the predecessor statutes." Laime v. United States, 540 U.S. 526, 534 (2004). "It is well established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" Id.

The Court is not convinced by the defendant's argument that an "unbound" reading of the statute would lead to the absurd result that a combatant could be prosecuted for capturing American soldiers during the course of an ongoing armed conflict in a foreign country.[15] Def.'s Reply Mot. Dismiss 16. The Court sees no anomaly in this result if the combatant has taken the

---

the Necessary and Proper Clause of the United States Constitution because it is broader than the Hostage Taking Convention. United States v. Yian, 905 F. Supp. 160 (S.D.N.Y. 1995), aff'd sub nom. United States v. Lue, 134 F.3d 79 (2d Cir. 1997) (finding that "[a] comparison of the Convention and the Act demonstrates that Congress' enactment of [18 U.S.C. § 1203] reasonably implements the Convention"). E.g., United States v. Santos-Riviera, 183 F.3d 367 (5th Cir. 1999) (holding that the statute did not violate equal protection principles by discriminating on the basis of alienage).

[15]    In his reply brief, the defendant makes clear that he is not challenging the statute as being inconsistent with the treaty. Def.'s Reply 21. The defendant agrees that "Congress is free to deviate from international law and could have criminalized a broader range of conduct pursuant to the Commerce Clause or some other constitutional source of legislative authority." Id.

particularly against acts of violence or intimidation"), art. 118 ("Prisoners of war shall be

released and repatriated without delay after the cessation of active hostilities."). It therefore

occurs to the Court that a combatant who lawfully detained a prisoner of war does not risk

liability under the statute since there would be no threat of death, injury or continuing detention

to the prisoner of war and release would not be conditioned on securing a third party's action or

abstention.

## II.    DEFENDANT'S MOTION TO SUPPRESS

The defendant filed a motion seeking to suppress statements he made during interviews

with agents from the Federal Bureau of Investigation ("FBI") on the ground that the statements

were unlawfully obtained after the defendant invoked his right to counsel. The Government

opposes the request to suppress the statements and asserts that the defendant knowingly,

voluntarily and intelligently waived his right to counsel.

The Government bears the burden of proving by a preponderance of the evidence that the

defendant waived his rights and voluntarily gave the statements that are the subject of the

suppression motion. The overriding concern is whether the statements resulted from official

coercion; thus, "[t]he voluntariness of a waiver of this privilege has always depended on the

absence of police overreaching." Colorado v. Connelly, 479 U.S. 157, 170 (1986). As the

Supreme Court explained in Missouri v. Seibert, 542 U.S. 600, 608-609 (2004):

> Accordingly, 'to reduce the risk of a coerced confession and to implement the
> Self-Incrimination Clause,' . . . this Court in Miranda concluded that 'the accused
> must be adequately and effectively apprised of his rights and  the exercise of those
> rights must be fully honored . . . .'  Miranda conditioned the admissibility at trial
> of any custodial confession on warning a suspect of his rights:  failure to give the
> prescribed warnings and obtain a waiver of rights before custodial questioning
> generally requires exclusion of any statements obtained.  Conversely, giving the
> warnings and getting a waiver has generally produced a virtual ticket of
> admissibility; maintaining that a statement is involuntary even though given after
> warnings and voluntary waiver of rights requires unusual stamina, and litigation

16

over voluntariness tends to end with the finding of a valid waiver.

Furthermore, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." North Carolina v. Butler, 441 U.S. 369, 373 (1979). "[C]ourts use an 'objective standard' for evaluating a defendant's waiver, and this takes into account 'the education, experience and conduct of the accused.'" United States v. Yunis, 859 F.2d 953, 965 (D.C. Cir. 1988). In addition, "a defendant's alienage and unfamiliarity with the American legal system should be included among these objective factors." Id. To determine whether a valid waiver occurred, "the focus must be on the plain meaning of the required warnings." Yunis, 859 F.2d at 964. Finally, "the ultimate determination that a waiver was knowing and voluntary must rest on the totality of the circumstances." Id. at 966.

The statements that are the subject of the defendant's request for suppression were made during interviews with Agents Alejandro Barbeito and Ronald LeBlanc on March 31, 2004 and April 2, 2004, and with Agents Barbeito and Joseph Deters on December 31, 2004. The interviews on March 31 and April 2 took place at the prison in Combita, Colombia, where the defendant was being detained. Hr'g Tr. 176. The interview on December 31 took place on board a flight from Colombia to the United States while the defendant was being extradited. Id. at 52. The relevant facts pertaining to each interview were found by the Court to be as follows.[17]

---

[17]    The Court held an evidentiary hearing regarding the defendant's motion that began in the morning on January 24, 2006 and concluded in the afternoon on January 25, 2006. Agents Barbeito and Deters testified during that hearing, as did the defendant's Colombian attorney, Oscar Silva-Duque. The Court's findings of fact are based on the testimony proffered by these witnesses. There were some factual inconsistencies between the witnesses about the events surrounding the three interviews. The Court found Agent Barbeito's testimony to be credible and consistent. Mr. Silva-Duque's reliability was diminished by the fact that he admitted his brother has been kidnaped and detained by FARC since September

1.  *March 31 Interview*

On March 31, 2004, Agents Barbeito and LeBlanc traveled to the Combita prison to interview the defendant. Id. at 8. Upon arriving at the prison, the agents went to the prison director's office to meet with Luis Barrero, a prosecutor from the Colombian Attorney General's Office and Miguel Diaz, an official from the Colombian Public Ministry. Id. at 8, 10. When the defendant's attorney, Oscar Silva-Duque, failed to appear for the interview, the prison director called him. Id. at 10. After concluding the telephone call with Mr. Silva-Duque, the prison director told Agents Barbeito and LeBlanc that Mr. Silva-Duque would be unable to attend the interview because of a health concern but authorized the agents to speak to the defendant in his absence. Id. at 10-11. During testimony at the hearing, Mr. Silva-Duque confirmed that he was unable to attend the interview but disputed that he received a telephone call from the prison director. Id. at 176, 180.

The agents then proceeded to the location where the defendant was being held and were advised by guards that the defendant was asking to speak to his attorney. Id. at 11. The agents requested that the defendant be permitted to speak to his attorney so that he could confirm why his attorney was not present. Id. After the defendant spoke to his attorney by telephone, the guards advised the agents that the defendant was agreeing to allow them to talk to him. Id. at 13.

_____

2002, Hr'g Tr. 191, and it was after his brother was kidnaped that he became the defendant's attorney, id. at 175. Consequently, he has a substantial vested personal interest -- if not an obvious bias -- in securing a favorable result for the defendant, who is accused of being a high-level FARC official. The Court also found that certain portions of his testimony lacked credibility. Consequently, to the extent there were factual disputes, the Court found that the greater weight of the evidence favored the Government's testimony, which was in several circumstances corroborated by documentary and photographic evidence. After the suppression hearing, both parties filed supplemental legal briefs refining their arguments based on the hearing testimony.

18

Mr. Barrero, the Colombian prosecutor, told the agents that some procedural issues needed to be resolved, so he went to speak to the defendant while the agents waited. Id. When he returned, he told the agents that the defendant did not want to talk to representatives of the Colombian government. Id. Agent Barbeito asked whether the defendant would speak to him and was told that the defendant did not want to talk to representatives of the United States government either. Id. Agent Barbeito then asked the Colombian officials whether he could speak to the defendant because it was not clear what the defendant had told them and it appeared that he was simply disavowing the authority of any government. Id. The officials reportedly went back to discuss the matter with the defendant and, upon returning, told the agents that the defendant was, in fact, willing to see them. Id. The prison guards also said that the defendant was willing to see the agents. Id.

Agent Barbeito testified that he went to the defendant's cell,[18] spoke to the defendant in his native Spanish language, told the defendant who he was, identified himself via his credentials (which were displayed at the hearing), and explained the purpose of his visit, which was to investigate the hostage taking of the three Americans. Id. at 13-15. The defendant initially questioned the agents' purpose because he thought they intended to question him about drug trafficking and an arms trafficking case based on a copy of a mutual legal assistance treaty request the defendant obtained from the Colombian prosecutor. Id. at 14, 23. Agent Barbeito clarified that the agents were there only to discuss the three Americans that were being held hostage. Id. at 15. After the defendant said that he was willing to talk, Agent Barbeito provided the defendant with a Miranda advice-of-rights form and read the form to him "out loud" in

---

[18]     Agent Barbeito testified that the defendant's cell was small, "[t]en feet by ten feet, maybe." Hearing Tr. 52.

Spanish. Id. at 17-18, 24. The Colombian prosecutor and official from the Public Ministry also read the form. Id. at 17-18, 24. Government Exhibit 1 was the original form in both English and Spanish, which stated "[y]ou do not have to speak to us nor do you have to answer any questions." Gov't Ex. 1. The form also stated that anything the defendant said could be used against him in the United States or anywhere else, that the defendant was entitled to the presence of an attorney during the interrogation, and that "[i]f you decide to speak to us without an attorney present, you reserve the right to decline to answer our questions at any time," among other rights. Id.

The defendant asked some questions and then told Agent Barbeito that he spoke to his attorney, who knew that the defendant would be speaking to the agents and was "okay" with him doing so. Id. at 18. The defendant also said that he watched American TV shows and knew what the rights were about. Id. at 19. Agent Barbeito testified that the defendant agreed to talk but said he would not sign the form because he did not want to "officialize" any meetings with the government. Id. at 20. After the defendant agreed to waive his rights, the parties discussed background information, the defendant's detention and proceedings in Ecuador, and a FARC communique. Id. at 24-26. The interview ended with the agents telling the defendant that they would obtain a copy of their Mutual Judicial Assistance Treaty request showing that they were interested in speaking only about the hostages and not other matters. Id. at 27. Agent Barbeito described the defendant's overall demeanor during the interview as very gracious, matter of fact and calm. Id. at 24. The interview lasted for approximately one hour and twenty minutes. Id.

### 2. April 2 Interview

The day after the March 31 interview, Agent Barbeito called Mr. Silva-Duque and made arrangements to interview the defendant again on April 2. Id. at 28. When Agent Barbeito

arrived at the Combita prison grounds, Mr. Silva-Duque approached him and identified himself. Id. Agent Barbeito showed Mr. Silva-Duque his credentials and identified himself as an FBI agent. Id. Agent Barbeito testified that Mr. Silva-Duque confirmed that he spoke to the prison director on March 31 and authorized the agents' access to meet with the defendant. Id. at 29. The agents entered the prison with Mr. Silva-Duque and went to the prison director's office. Id. Mr. Silva-Duque went to speak to the defendant alone. Id. at 30. The prison director asked a prison guard to go to the defendant's cell and obtain the defendant's permission to allow the agents to enter the prison and interview him. Id. Government's Exhibit 3 was an original copy of the letter the defendant wrote to the prison director granting permission for the agents to interview him and stating "I hereby request an authorization of the entry of the officers of the American embassy for the interview of today." Id. at 193. Mr. Silva-Duque, the defendant's counsel, testified at the hearing that he drafted the letter. Id. at 194 (stating that "I was the one who drafted it").

The FBI agents then proceeded to the building where the defendant was detained and told the defendant that they were going to review the Miranda advice-of-rights form again. Id. at 33. The defendant's attorney was present when the agents provided the defendant with the advice-of-rights form. Id. at 34. After the agents began reading the form out loud to the defendant, the defendant said it was unnecessary to read the form again, so the agents gave the form to the defendant's counsel, who read it and indicated that he had no objections. Id. The defendant then told the agents that he was willing to talk to them but again declined to actually sign the form. Id. at 35. The interview lasted approximately one hour and forty-five minutes. The defendant's attorney was present for the duration of the interview. Describing the defendant's demeanor during the interview, Agent Barbeito said he "looked fine" and "[i]n good condition." Id. at 52.

21

### 3. December 31 Interview

The third interview between the defendant and the FBI agents took place on December 31 while the defendant was being extradited to the United States. Id. at 52. On that day, Agent Barbeito said the defendant was happy to see him and indicated that he felt better after seeing Agent Barbeito because he was nervous about the extradition process. Id. at 54. Agent Barbeito started talking to the defendant during a helicopter flight from the Combita prison to the airport in Bogota but their conversation was limited because of the noise from the helicopter. Id. at 54. The defendant was transported by Colombian authorities from the helicopter to an official FBI plane, which Agent Barbeito said was used by the Attorney General for official business. Id. at 53, 56. Agent Barbeito described the plane as "kind of large" with about 10 to 15 seats. Id. at 56. The defendant was seated in the last seat at the back of the plane and Agent Barbeito sat across from him. Id. at 57. Agent Joseph Deters was sitting next to Agent Barbeito and there were also members of the FBI Miami "SWAT" Team on the plane. Id. Agent Barbeito had a sidearm that was displayed but holstered. Id. at 59. He testified that at no time did he pull his weapon out. Id. Agent Barbeito engaged in a "cordial" conversation with the defendant about what was happening and where they were going. Id. Once the plane reached cruising altitude, Agent Barbeito read the defendant the same advice-of-rights form that he provided the defendant on the two prior occasions. Id. at 59-60. Agent Barbeito testified that he read the entire form to the defendant in Spanish. Id. at 61. After reading the advice-of-rights form to the defendant, the defendant said that he was now willing to sign the form because he was no longer in a Colombian prison. Id. The defendant did not ask any questions about the form. Id. at 62.

The agents then talked to the defendant the duration of the four-to-five-hour flight, although Agent Barbeito said the defendant did most of the talking. Id. at 62, 63. Agent

22

Barbeito testified that "at one point [the defendant] apologized for talking so much, but he said it was due to having been a prisoner for so long and now he had somebody to talk to." Id. at 63. Agent Barbeito also testified that the defendant was provided water, "took a lot of bathroom breaks during the flight," and ate potato chips and cookies. Id. at 65. Agent Barbeito said that during their discussion the defendant described the conditions of his confinement in Colombia favorably and said that he was treated well and ate better in prison than he did "in the field." Id. While talking, the defendant described his background as an economist and professor at a university. Id. at 70. Agent Barbeito further testified that the defendant has requested classical literature and biographies to read while in prison. Id. at 70-72.

In his motion to suppress, the defendant argues that he invoked his right to counsel on three separate occasions prior to the March 31, 2004 interview with Agents Barbeito and LeBlanc, so any subsequent waiver of his Miranda rights on that date was invalid, particularly in light of his limited understanding of his rights under United States law. Def.'s Supp. Mot. Suppress 6. The defendant further argues that because Agents Barbeito's and LeBlanc's identity was unclear to him, and he claims he was misled about the nature and subject of the interviews that took place on March 31, 2004 and April 2, 2004, his waiver of rights on those dates was not knowing, voluntary and intelligent. Id. at 7. The defendant also argues that the waiver of his rights on December 31, 2004 likewise was not knowing, voluntary and intelligent because it occurred while he was in handcuffs and leg restraints on an FBI plane transporting him to the United States, he was surrounded by law enforcement agents from the FBI and Drug Enforcement Agency ("DEA"), there were no attorneys on board who were not government officials, and he was not advised that an attorney could be made available to him upon his request. Id. at 8. Lastly, the defendant argues that because any waiver during the March 31,

2004 interview was invalid, and the circumstances of that interview contributed to his participation in the subsequent interviews, all statements he made during the subsequent interviews were tainted and inadmissible. Id. at 8-9.

The Court declines to hold that the defendant's statements were obtained in violation of his right to counsel or by virtue of a waiver that failed to be knowing, voluntary and intelligent. To the contrary, the Government has met its burden of proving by a preponderance of the evidence that the defendant knowingly, voluntarily and intelligently waived all his Miranda rights on March 31, April 2 and December 31. With regard to the March 31 interview, the evidence shows that the FBI agents expected the defendant's attorney to be present when they went to Combita prison, defendant's attorney authorized the FBI agents to speak to the defendant without him present and, when the agents arrived where the defendant was being housed and discovered that the defendant was asking to speak to his attorney, his attorney was made available to him by telephone. Mr. Silva-Duque confirmed at the hearing that he spoke to the defendant that day. Id. at 177. After speaking to his attorney, the defendant agreed to meet with the agents. Although the Colombian officials met with the defendant first, and then reported that the defendant was unwilling to meet with officials from either Colombia or the United States, Agent Barbeito asked to clarify whether the defendant was unwilling to meet personally with him and Agent LeBlanc.

Under the circumstances presented here, it was not improper for Agent Barbeito to seek to clarify the rights the defendant was invoking, to the extent he was invoking any such rights. The defendant's statement that he did not want to talk to government officials was ambiguous and certainly could not be claimed to be a clear and unequivocal invocation of his right to counsel. See Davis v. United States, 512 U.S. 452, 458-459 (1994) ("But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the

24

circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."). Moreover, the defendant never argued that this statement effectively invoked his right to remain silent. Although the defendant claims that the Colombian officials "informed the agents that Mr. Trinidad did not wish to meet with them without his attorney," Def.'s Supp. Mot. 3, the hearing testimony simply does not bear this out. According to Agent Barbeito's testimony, the Colombian officials indicated only that the defendant did not want to talk to anyone from the government, and Agent Barbeito attributed this statement to the defendant's political beliefs disavowing the authority of the Colombian government. Hr'g Tr. 13. Nowhere in the record is there any evidence that the Colombian officials told the agents that the defendant did not want to meet with them <u>without his attorney</u>.

The evidence shows that the defendant verbally agreed to waive his <u>Miranda</u> rights after being advised of those rights pursuant to a form that clearly identified the rights to which he was entitled, that anything he said could be used against him, that he was entitled to counsel, and that he could refuse to talk at any time. The evidence further shows that he was advised of his rights in his native language, he asked questions about his rights (Hr'g Tr. 18), he said he understood his rights based on American television shows (Hr'g Tr. 19), he is a well-educated former university professor, and he did not waive his rights under circumstances that in any way suggested overreaching on the part of the FBI agents or indicated that he was otherwise being coerced.

The same can be said for the interviews that took place on April 2 and December 31. The April 2 interview took place with the defendant's attorney present. <u>Id.</u> at 34. Mr. Silva-Duque testified that he specializes in criminal law and has been a practicing attorney for 12 years. <u>Id.</u> at

175. He has worked as both a prosecutor and a defense attorney. Id. He conceded that he never objected to the interview on that day. Id. at 187-89. Whether he thought Agent Barbcito worked for the FBI or was a "prosecutor" is to no avail given the evidence that Agent Barbeito identified himself and the fact that Mr. Silva-Duque made no effort to clarify the agents' identities. His lack of familiarity with United States law does not override these points since he obviously understands the underlying policies, and could counsel his client accordingly, given that he stated "[i]t is absolutely inadmissible under Colombian law that a judicial proceeding would take place, that somebody from a foreign government would come in and talk . . . to a prisoner without the presence of their lawyer." Id. at 189. He therefore understood the right to counsel and had the education and corollary intellect to understand the rights outlined in a straightforward fashion on the waiver form, which he reviewed. Id. at 34.

As far as the December 31 interview is concerned, the mere fact that the defendant might have been in leg irons and handcuffs, and surrounded by federal agents, does not under the totality of the circumstances imply that the defendant was coerced to waive his rights. The evidence showed that he was allowed to change his attire into something he was more comfortable wearing, his disposition was good and he was chatty, he was allowed to take breaks and given water and snacks, and he was comfortably seated on the Attorney General's official airplane.

Based on the totality of the circumstances, the Government has met its burden and proved that the defendant knowingly, voluntarily and intelligently waived his Miranda rights. Accordingly, the Court will deny the motion to suppress.

26

## III.    DEFENDANT'S MOTION TO STRIKE

"'[A] motion to strike surplusage [from the indictment] should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.'" United States v. Rezaq, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (affirming the District Court's refusal to strike language in the indictment after concluding that references to the defendant shooting aircraft passengers was relevant to establish that defendant had seized the aircraft and maintained control of it by "force" or "intimidation," which were elements of the crime of air piracy). The decision whether to strike is within the Court's discretion;[19] however, "the standard under Rule 7(d) has been strictly construed against striking surplusage." United States v. Jordan, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980). Indeed, "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." United States v. Climatemp, Inc., 482 F. Supp. 376, 391 (N.D. Ill. 1979).

Pending before the Court is Simon Trinidad's Motion to Strike Surplusage, which seeks an order striking the following from the indictment:  (1) all references to the deaths of Thomas Janis and Luis Alcides Cruz contained in Count 1 and incorporated into Counts 2-4, (2) use of the term "foreign terrorist organization" in paragraph 1 of Count 1 and incorporated into Counts 2-4, and (3) the reference to "terrorists" in Count 5. Def.'s Mot. Strike 1. The defendant seeks to strike these references because they are "unduly prejudicial and irrelevant to the charges." Id. The Government opposes Trinidad's motion on the ground that "the defendant cannot meet his

---

[19]    "We review the trial court's decision whether to strike surplus language from an indictment when an appellant claims prejudice under an 'abuse of discretion' standard." United States v. Edmond, 52 F.3d 1080, 1112 (quoting United States v. Jordan, 626 F.2d 928, 930-32 (D.C. Cir. 1980)).

heavy burden under Rule 7(d) because all of the language he challenges in the indictment is relevant to one or more of the offenses." Gov't Opp. Mot. Strike 4.

The Court agrees that all of the language the defendant seeks to strike is relevant to the charges in the indictment. With regard to the deaths of Thomas Janis and Luis Alcides Cruz, evidence of these deaths are relevant to the Government's requirement to prove that the defendant or his co-conspirators seized by force and "threatened to kill, injure or continue to detain" the occupants of the downed aircraft. See 18 U.S.C. § 1203. Similarly, it is self evident that references to the term "terrorist" in the indictment are relevant to the Government's proof of whether the defendant violated 18 U.S.C. § 2339A, which is titled "Providing Material Support to Terrorists." It also follows that references to FARC as a "terrorist organization" also are relevant for the same purpose, regardless of whether the body of the statute identifies these terms. In light of the nature of the charges, none of the terms are so prejudicial that they warrant removal from the indictment. Accordingly, the Court will deny the defendant's Motion to Strike Surplusage.

## CONCLUSION

For the reasons set forth above, the Court will deny the defendant's Motion to Dismiss, Motion to Suppress, and Motion to Strike Surplusage. An appropriate Order will accompany this Memorandum Opinion.

March 25, 2006

_____
Thomas F. Hogan
Chief Judge